# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| KATHRYN IRWIN, | : | Civil No. 1:21-CV-00186 |
| Plaintiff, | : | |
| v. | : | |
| FRY COMMUNICATIONS, INC., | : | |
| Defendant. | : | Judge Jennifer P. Wilson |

## **MEMORANDUM**

Before the court is a motion for summary judgment filed by Defendant seeking judgment in its favor on all three counts in Plaintiff's complaint. (Doc. 34.) Based on the undisputed facts, Plaintiff fails to bring prima facie claims. For the reasons that follow, the court will grant the motion.

## FACTUAL AND PROCEDURAL BACKGROUND[1]

Plaintiff, Kathryn Irwin ("Irwin"), has brought this suit against her former employer, Defendant, Fry Communications, Inc. ("Fry"), raising claims of discrimination against Fry under federal and state law. (Doc. 1.) Irwin worked for Fry from December 14, 1999, until about October 2018. (Doc. 35, ¶ 4.) In 2018, she worked as a Saddle Operator in Fry's bindery department. (*Id.* ¶ 5.) Saddle

---

[1] In considering the instant motion for summary judgment, the court relied on the uncontested facts. Where facts were disputed, the court viewed the facts in the light most favorable to the nonmoving party and has drawn all inferences in favor of the nonmovant, pursuant to the relevant standard for deciding a motion for summary judgment. *See Doe v. C.A.R.S. Protection Plus, Inc.*, 527 F.3d 358, 362 (3d Cir. 2008).

1

Operators generally worked in Fry's Building 4 but might also be assigned on a given day to work on "co-mail" machines in Fry's adjacent Building 5.  (*Id.*)

On June 13, 2018, Irwin was assigned to her usual assignment—the M-8 Binder machine in Building 4.  (*Id.* ¶ 6 & n.1.)  That day, David King ("King"), was assigned to assist Irwin in her responsibilities.  (*Id.* ¶ 7.)  King usually worked in Building 5 as a co-mail assistant on a different schedule than Irwin.  (*Id.* ¶ 8.)  King had trouble keeping up, which markedly slowed Irwin's progress.  (*Id.* ¶ 10; Doc. 36-2, pp. 25–26.)[2]  King looked sick, had a bad attitude, and kept saying "this is bullshit."  (*Id.*)  Irwin, aware that management would not be happy about her slow progress, twice notified Mike Vaughn ("Vaughn"), a day-shift floor supervisor, of King's pace.  (Doc. 35, ¶¶ 5, 11; Doc. 36-2, p. 26.)

At Vaughn's direction, Irwin told King to report to the supervisor's office.  (Doc. 35, ¶¶ 12, 13.)  Upon reporting to the supervisor's office, King was told to go home for the day.  (*Id.* ¶ 14.)  Returning from the supervisor's office to his workstation, King was very upset.  He picked up bolts, small pieces of metal, and a tape dispenser from the workstation and threw them in all directions.  (Doc. 36-2, pp. 27–28.)  He even threw his lunchbox and drink.  (*Id.* at 27.)  Before leaving, King threatened to punch Irwin in the face and twice told her to "suck his dick."  (*Id.*)  After the incident, Irwin finished her shift.  (Doc. 35, ¶ 16.)  Later that day,

---

[2] For ease of reference, the court utilizes the page numbers from the CM/ECF header.

Irwin told Vaughn about the incident. (Doc. 36-2, p. 29.) Vaughn relayed the incident to the other day-shift floor supervisor, Jeff Langland ("Langland"), and the department manager, Mick Hutchinson ("Hutchinson"). (Doc. 35, ¶¶ 5, 17.)

The next day, Irwin, to ensure she did not get into trouble for her low numbers the day before, told Langland about the incident with King. (Doc. 36-2, p. 30.) When Langland inquired, Irwin told him that she did not want to get King in trouble. (Doc. 35, ¶ 18.) But she stated that she did not want to work with King anymore. (*Id.* ¶ 19.) Irwin also told Hutchinson about the incident and that she did not want to work with King again. (*Id.* ¶¶ 20–21.)[3] Hutchinson asked Irwin if she wanted to submit a complaint. (*Id.* ¶ 22.) Irwin replied that she did not—that, years before, she had filed a complaint "and nothing came out of it." (Doc. 36-2, p. 32.)[4] Irwin also told Hutchinson that she did not want to get King, or anybody, in trouble.

After Irwin's incident with King, she was never scheduled to work with him again. (Doc. 35, ¶ 24.) But on October 22, 2018, when Irwin clocked in and checked the schedule, she saw she was assigned to a co-mail machine in

---

[3] Irwin states that Hutchinson told her that she would not have to work with King again. (Doc. 36-2, p. 33.) Hutchinson testified that he agreed to do what he could, but, without an official investigation, he could not guarantee that she would not have to work with King. (Doc. 36-4, p. 21.)

[4] According to Irwin's deposition, this relates to a 2002 or 2003 incident. (Doc. 36-2, p. 32.) There is no indication that this complaint pertained to King.

Building 5.  (*Id.* ¶ 26.)  On seeing that she was assigned to work in Building 5, Irwin spoke with Vaughn to see if there had been any changes in the schedule.  (*Id.* ¶ 29; Doc. 36-2, p. 37.)  Vaughn told Irwin she was assigned to Building 5 and, Irwin testified, she told Vaughn there was an agreement that she would not have to work near King.  (Doc. 36-2, p. 37.)  Irwin testified that she did not mention King further but repeatedly asked Vaughn if she could work in Building 4 instead; Vaughn directed her to report to Building 5.  (Doc. 36-2, p. 37; Doc. 35, ¶ 29.)  Instead, Irwin clocked out and left without telling anyone or getting her timecard signed.  (Doc. 35, ¶ 32.)  King was not scheduled to work on October 22, 2018, and he was not on the premises.  (*Id.* ¶ 27.)  Irwin admits she did not check the schedule to see if King was working that day.  (*Id.* ¶ 28.)  She alleges that she left without getting approval, notifying her supervisor, or getting her timecard signed because she began having a panic attack at the prospect of working with King.  (*See id.* ¶ 32.)[5]

The next day, Hutchinson asked Irwin why she had left work the day before without telling anyone.  (Doc. 35, ¶ 33.)  According to Irwin, she reminded Hutchinson that he had promised she would not have to work with King.  (Doc. 36-2, p. 40.)  At this time, Irwin appeared not to have told Hutchinson, or

---

[5] In apparent conflict, Irwin's testimony suggests that her panic attack began only after she had clocked out without gaining approval or providing notice.  (*See* Doc. 36-2, p. 38.)

anyone else, about her panic attack. At no time had she expressed any remorse for her leaving work at the beginning of her shift without notifying anyone. (Doc. 35, ¶ 39.) Hutchinson informed Irwin that she was not to return to work pending an investigation of her conduct the day before. (*Id.* 35; Doc. 37-2, ¶ 35.)

On October 24, 2018, Fry's Human Relations Manager, Kim Boylan ("Boylan"), spoke with Irwin by phone. (Doc. 35, ¶ 5; Doc. 36-3, p. 6.) Irwin told Boylan she had left work on the date in question due to an anxiety attack. (Doc. 36-3, p. 6.) When asked why she had consulted neither the schedule nor Hutchinson, who made the schedules, to see if King was working, Irwin replied that she did not know. (*Id.*) A few days later, Fry terminated Irwin's employment. (Doc. 35, ¶ 4; Doc. 36-2, p. 40.)

Irwin filed the three-count complaint bringing this action on February 3, 2021. (Doc. 1.) First, the complaint raises a claim for retaliation in violation of 42 U.S.C. § 2000e, *et seq.*, "Title VII" (Count I). (*Id.* ¶¶ 30–37.) Next, it raises a claim for disparate treatment under Title VII, alleging that Fry, by firing Irwin, treated Irwin differently than other employees on account of her sex (Count II). (*Id.* ¶¶ 38–42.) Finally, it raises these same claims under the Pennsylvania Human Relations Act, "PHRA" (Count III). (*Id.* ¶¶ 43–48.)

On March 9, 2021, Fry filed a motion to dismiss, which the court denied on November 11, 2021. (Docs. 8, 24.) Fact discovery closed on May 31, 2022, and

on June 30, 2022, Fry filed this motion for summary judgment. (Docs. 31, 34.) The motion has been briefed and is ripe. (Docs. 35, 36, 37, 38.) On August 10, 2022, the court stayed all trial-related case management deadlines pending the resolution of this motion. (Doc. 39.)

## JURISDICTION

Because this case raises a question under federal law through Title VII, the court has original jurisdiction over this case under 28 U.S.C. § 1331. The court has supplemental jurisdiction over the state law claim under 28 U.S.C. § 1367, and venue is appropriate under 28 U.S.C. § 1391.

## STANDARD OF REVIEW

A court may grant a motion for summary judgment when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute of fact is material if resolution of the dispute "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Summary judgment is not precluded by "[f]actual disputes that are irrelevant or unnecessary." *Id.* "'A dispute is genuine if a reasonable trier-of-fact could find in favor of the nonmovant' and 'material if it could affect the outcome of the case." *Thomas v. Tice*, 948 F.3d 133, 138 (3d Cir. 2020) (citation omitted).

In reviewing a motion for summary judgment, the court must view the facts in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor. *Jutrowski v. Twp. of Riverdale*, 904 F.3d 280, 288 (3d Cir. 2018) (citing *Scheidemantle v. Slippery Rock Univ. State Sys. of Higher Educ.*, 470 F.3d 535, 538 (3d Cir. 2006)). The court may not "weigh the evidence" or "determine the truth of the matter." *Anderson*, 477 U.S. at 249. Instead, the court's role in reviewing the facts of the case is "to determine whether there is a genuine issue for trial." *Id.*

The party moving for summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56(c)). The non-moving party must then oppose the motion, and in doing so "'may not rest upon the mere allegations or denials of [its] pleadings' but, instead, 'must set forth specific facts showing that there is a genuine issue for trial. Bare assertions, conclusory allegations, or suspicions will not suffice.'" *Jutrowski*, 904 F.3d at 288–89 (quoting *D.E. v. Cent. Dauphin Sch. Dist.*, 765 F.3d 260, 268–69 (3d Cir. 2014)).

Summary judgment is appropriate where the non-moving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322. "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252. "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

## DISCUSSION

Fry argues that Irwin has failed to establish prima facie claims for disparate treatment and retaliation. It argues that the former fails for lack of direct or indirect evidence of discrimination and the latter for lack of the requisite protected conduct. (Doc. 36, pp. 13–17, 19–24.) In the alternative, Fry argues that Irwin's prima facie claims fail because she cannot show that Fry's legitimate non-discriminatory reason for terminating her employment was pretextual. (*Id.* at 17–19, 25–26.)

### A. Irwin's allegations do not raise a prima facie claim for disparate treatment.[6]

As Fry notes in its brief, Title VII makes it unlawful for an employer to "discriminate against any individual with respect to [her] compensation, terms, conditions, or privileges of employment, because of such individual's race, color, sex, or national origin." (*Id.* at 13 (quoting 42 U.S.C. § 2000e-2(a)(1)).) Under Third Circuit precedent, a plaintiff bringing a claim under the burden-shifting framework of Title VII may "present either direct or indirect evidence to prove that she was subjected to unlawful discrimination." *Pivirotto v. Innovative Sys., Inc.*, 191 F.3d 344, 342 n.4 (3d Cir. 1999) (citation omitted).

Absent direct evidence of discrimination, Irwin must show what the court in *Pivirotto* called "indirect evidence" and what the court in *Jones*, 198 F.3d at 413, called "circumstantial evidence" of discrimination. Claims supported by circumstantial evidence are governed by the *McDonnell Douglas* burden-shifting framework. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). The *McDonnell Douglas* analysis follows three stages. First, the plaintiff must establish a prima facie claim. *Jones*, 198 F.3d at 410. Second, if the plaintiff establishes a prima facie claim, the burden shifts to the defendant "to articulate

---

[6] The standard for disparate treatment and retaliation claims are the same under Title VII and the PHRA. *Jones v. Sch. Dist. of Phila.*, 198 F.3d 403, 409 (3d Cir. 1999). Therefore, although Irwin's claims span three counts in her complaint, the court treats them as two claims—one for disparate treatment and one for retaliation.

some legitimate, nondiscriminatory reason for the employee's rejection." *Id.* Third, and finally, if the defendant provides such reason, the plaintiff must prove by a preponderance of the evidence that the defendant's legitimate and nondiscriminatory reason is a pretext for discrimination. *Id.*

To establish a prima facie case of sex discrimination at the first step of the *McDonnell Douglas* framework, a plaintiff must show four elements: "(1) she is a member of a protected class; (2) she was qualified for the position in question; (3) she suffered an adverse employment action; and (4) that adverse employment action gives rise to an inference of unlawful discrimination." *Tourtellotte v. Eli Lilly & Co.*, 636 F. App'x 831, 842 (3d Cir. 2016) (citing *Jones*, 198 F.3d at 410–11). A plaintiff may satisfy the fourth element by providing "comparator evidence showing that similarly situated individuals who are not members of the protected class were treated more favorably." *Loving v. FedEx Freight, Inc.*, No. 3:18-CV-508, 2020 WL 2306901, at *8 (M.D. Pa. May 8, 2020) (citing *Durst v. City of Phila.*, 798 F. App'x 710, 713 (3d Cir. 2020)). Such similarly situated comparators "must be similarly situated in all relevant respects." *Id.* (quoting *Wilcher v. Postmaster Gen.*, 441 F. App'x 879, 881–82 (3d Cir. 2011)).

In addressing Irwin's prima facie claim, the parties' dispute is limited to the fourth element. Fry argues that there is no direct or circumstantial evidence to suggest that Irwin's firing gives rise to an inference of discrimination. (Doc. 36,

pp. 13–17.)  Specifically, it argues that Irwin has failed to identify any appropriate comparators—employees who engaged in similar conduct but were treated differently—from which to infer disparate treatment.  (*Id.* at 14–17.)

Fry points out that, to be a similarly situated comparator, a person "must have dealt with the same supervisor, have been subject to the same standards and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it." (*Id.* at 15 (quoting *Ogden v. Keystone Resid.*, 226 F. Supp. 2d 588, 603 (M.D. Pa. 2002)).)  Here, Fry asserts that Irwin's firing resulted from insubordinate conduct so brazen that no other employees had done the same.  (*Id.*; Doc. 35, ¶ 54; Doc. 36-4, p. 23.)  Fry also submits that other employees who had left their shift early, at the very least notified their supervisors of their departure.  (Doc. 35, ¶ 55; Doc. 36-4, p. 23–24.)  In every instance, Fry asserts, and its department manager has testified, these employees have expressed remorse and, because of their conduct, were issued a written warning, suspended, or suspended pending termination.  (Doc. 35, ¶ 56; Doc. 36-4, p. 24.)

In her brief, Irwin asserts that she observed male co-workers "walk off the job without permission [and] not be terminated despite conducting the same 'offense.'"  (Doc. 37-3, p 9.)  To support this, Irwin points to five comparators.  She concedes that four of the five were dissimilar insofar as they had a different

supervisor, different level of experience or seniority, or engaged in different conduct. (Doc. 37-2, ¶¶ 48–50, 53; Doc. 36-2, pp. 44–45.) But Irwin alleges that the remaining one, Myers, walked off the job without being terminated. (Doc. 37-2, ¶¶ 52.)

Irwin's allegations about Myers are not supported by evidence. During her testimony, Irwin admitted that she did not know whether he had permission to leave work early. (Doc. 36-2, p. 45.) Nor did she know whether he told his supervisor when he left early. (*Id.*) Her only basis for alleging that Myers engaged in similar conduct was that she witnessed him leave early and did not get his timecard signed. (*Id.*)

While an affidavit based on personal knowledge setting forth "specific facts that reveal a genuine issue of material fact" is sufficient to defeat summary judgment, "conclusory, self-serving affidavits are insufficient to withstand a motion for summary judgment." *Paladino v. Newsome*, 885 F.3d 203, 208 (3d Cir. 2018) (quoting *Kirleis v. Dickie, McCamey & Chilcote, P.C.*, 560 F.3d 156, 161 (3d Cir. 2009)). Irwin's testimony is the latter, and she has failed to set forth sufficient facts to support her allegations.

Because Irwin has not provided any evidence of similarly situated individuals who received disparate treatment, she has failed to establish an inference of unlawful discrimination. Failing to establish this fourth element, she

does not raise a prima facie claim of disparate treatment. Therefore, Fry is entitled to summary judgment for this cause of action.

### B. Irwin's allegations do not raise a prima facie claim of retaliation.

Raising a prima facie case for retaliation requires a plaintiff to show three elements: (1) she engaged in protected activity, (2) the defendant took an adverse action against the plaintiff, and (3) there was a causal connection between the protected activity and the adverse action. *Moody v. Atl. City Bd. of Educ.*, 870 F.3d 206, 220 (3d Cir. 2017).

To engage in a protected activity, that is to establish the first element, the plaintiff must "hold an objectively reasonable belief, in good faith, that the activity they oppose is unlawful under Title VII." *Moore v. City of Phila.*, 461 F.3d 331, 341 (3d Cir. 2006). In interpreting the statute, the Supreme Court instructs that Title VII is not meant to be a "general civility code." *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998) (citation omitted). It does not ban all physical or verbal harassment at work, but instead only prohibits discrimination on the basis of sex. *Oncale v. Sundowner Offshore Servs.*, 523 U.S. 75, 80 (1998). The Court has not held that harassment, even between different sexes, is automatically workplace discrimination simply because the words "have sexual content or connotations." *Id.* Instead, the "critical issue" is "whether members of one sex are exposed to disadvantageous terms or conditions of employment to which members of the other

13

sex are not exposed." *Id.* (citation omitted). In other words, "[v]erbal and physical harassment, no matter how unpleasant and ill-willed, is simply not prohibited by Title VII if not motivated by the plaintiff's gender . . . ." *Shramban v. Aetna*, 262 F. Supp. 2d 531, 536 (E.D. Pa. 2003) (citation omitted), *aff'd* 115 F. App'x 578 (3d Cir. 2004).

Other jurisdictions have concluded that, to satisfy the first element of a retaliation claim, a plaintiff must allege more than sexually explicit remarks. Rather, the remarks must support a reasonable inference that they "were directed at [the plaintiff] on account of [her] gender. Although explicit sexual content or vulgarity may often take a factfinder a long way toward concluding that harassing comments were in fact based on gender . . . this need not necessarily be the case." *Johnson v. Hondo, Inc.*, 125 F.3d 408, 412 (7th Cir. 1997) (citation omitted). Courts have noted that at the summary judgment stage, vulgar outbursts where an employee tells another to "suck my dick" may be viewed as "expressions of animosity" instead of sexual harassment if there are no additional facts to suggest that the comment was motivated by the plaintiff's gender or sex. *Id.*; *see also Farra v. Gen. Motors Corp.*, 163 F. Supp. 2d 894, 908 (S.D. Ohio 2001).

In the present case, Irwin contends that her incident with King was sexual harassment and that her reporting it to her managers and supervisors constitutes a

protected activity. (Doc. 37-3, p. 13.) Irwin's assertions are conclusory. They do not rely on legal support either for underlying principles or factual similarities.[7]

Viewing the undisputed facts in the light most favorable to the nonmoving party, the court concludes that Irwin has failed to show that she was engaged in an activity protected by Title VII. She alleges that King made two sexually explicit remarks. But, from the record, there is insufficient evidence for a jury to reasonably conclude that Irwin held a reasonable good faith belief that King's inappropriate outburst resulted from her sex. Instead, the evidence clearly shows that King's actions arose from animus toward Irwin because she reported him to a supervisor. Regarding Irwin's retaliation claim, there is no genuine issue of material fact and Fry is entitled to judgment as a matter of law.

## CONCLUSION

For the reasons stated herein, the court will grant Defendant's motion for summary judgment on all counts. An appropriate order will issue.

s/Jennifer P. Wilson<br>
JENNIFER P. WILSON<br>
United States District Court Judge<br>
Middle District of Pennsylvania

Dated: February 13, 2023

---

[7] Irwin, in passing, asserts other conclusions of fact and legal theories, but they are equally unsupported by fact and law. (*See* Doc. 37-3, pp. 11, 13–14.)